J-S57029-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: T.S.A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.B., MOTHER | |
| | No. 638 EDA 2014 |

Appeal from the Decree January 15, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000727-2013
CP-51-DP-0001514-2012

| IN THE INTEREST OF: D.K.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.B., MOTHER | |
| | No. 639 EDA 2014 |

Appeal from the Decree January 15, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000728-2013
CP-51-DP-0001512-2012

| IN THE INTEREST OF: T.M.A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.B., MOTHER | |
| | No. 640 EDA 2014 |

J-S57029-14

Appeal from the Decree January 15, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000729-2013
CP-51-DP-0001513-2012

BEFORE: DONOHUE, J., MUNDY, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                            **FILED MARCH 03, 2015**

Appellant, J.B. (Mother), appeals from the January 15, 2014 decrees involuntarily terminating her parental rights, and the January 15, 2014 orders changing the permanency goals to adoption with respect to her sons, D.K.R., born in August 2006, and T.M.A., born in September 2009, and her daughter, T.S.A., born in June 2012 (collectively, the Children).[1] After careful review, we affirm.

The trial court aptly set forth the factual history of this case in its opinion, which we adopt herein. ***See generally*** Trial Court Opinion, 4/21/14, at 1-9. We summarize the relevant procedural history of this case as follows. On December 27, 2013, the Philadelphia Department of Human Services, Children and Youth Division (DHS), filed separate petitions for the involuntary termination of Mother's parental rights and for a goal change to adoption. The trial court held a hearing on the petitions on January 15, 2014, during which DHS presented the testimony of its caseworker, Betsy

_____

[1] On January 15, 2014, the trial court entered a decree involuntarily terminating the parental rights of D.K.R.'s natural father, R.R. On March 12, 2014, the trial court entered decrees involuntarily terminating the parental rights of T.M.A.'s and T.S.A.'s natural father, A.A. Mother testified that A.A. died in October 2012, prior to the subject proceeding. N.T., 1/15/14, at 43-44. Neither R.R. nor A.A. is a party to this appeal.

Lee, and foster care agency caseworker, Amina Huff.[2] The Child Advocate presented the testimony of T.M., the Children's foster mother. Mother testified on her own behalf.

By decrees dated and entered on January 15, 2014, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3] By orders dated January 15, 2014, the court changed the Children's goal to adoption. On February 18, 2014, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), which this Court consolidated *sua sponte*.[4] **See generally** Pa.R.A.P. 513.

_____

[2] Counsel for the parties stipulated that, if called to testify by DHS, the witnesses would testify consistent with the Statement of Facts attached as Exhibit A to the involuntary termination petitions. N.T., 1/15/14, at 6.

[3] We observe that the trial court sent the certified record to this Court more than one month past the date it was due. Therefore, despite diligence by this Court, the processing of this appeal has been delayed.

[4] As noted above, the trial court entered its final decrees terminating Mother's parental rights to the Children and orders changing the permanency goal to adoption on Thursday, January 15, 2014. The trial court's docket indicates that notices of entry of all of the decrees and orders were served on Mother by hand delivery on that same day. **See generally** Pa.R.C.P. 236 (directing the prothonotary to immediately provide each party and/or counsel with notice of the entry of an order and to note the same in the docket). Therefore, Mother's notices of appeal were due on Friday, February 14, 2014. **See generally** Pa.R.A.P. 903(a). However, upon informal inquiry, this Court has learned that the trial court was closed on February 14, 2014 due to inclement weather. Additionally, Monday, *(Footnote Continued Next Page)*

On appeal, Mother presents the following two issues for our review.

> 1. Whether the trial court committed error by involuntarily terminating [M]other's parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (a)(8)?
>
> 2. Whether the trial court committed error by involuntarily terminating [M]other's parental rights and changing the permanency goal from reunification with the parent to adoption without giving primary consideration to the developmental, physical and emotional needs and welfare of the children as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 5.

The crux of Mother's argument on appeal is that DHS did not satisfy its burden of proof with respect to the goal change to adoption and the involuntary termination of her parental rights because DHS failed to provide reasonable efforts to reunify her with the Children. Mother's Brief at 18. We first address Mother's argument with respect to the change of goal orders, which we review according to the following standard of review.

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its

_(Footnote Continued)_ ───────────

February 17, 2014 was President's Day, a Commonwealth holiday. It is axiomatic that when calculating a filing period, government holidays are excluded. 1 Pa.C.S.A. § 1908. Therefore, Mother had until Tuesday, February 18, 2014 to timely file her notices of appeal. As a result, we are satisfied that we possess appellate jurisdiction in this case.

judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted), *appeal denied*, 959 A.2d 320 (Pa. 2008); *accord In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

This matter is controlled by the Juvenile Act[5], which was amended in 1998 to conform to the federal Adoption and Safe Families Act (ASFA).[6] *In re M.S.*, 980 A.2d 612, 615 (Pa. Super. 2009), *appeal denied*, 985 A.2d 220 (Pa. 2009). With respect to the two acts, we have recognized the following.

Both statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent …. ASFA promotes the reunification of foster care children with their natural parents when feasible …. Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved "whenever possible."

*Id.*, *citing* 42 Pa.C.S.A. § 6301(b)(1). As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her

---

[5] 42 Pa.C.S.A. §§ 6301-6375.

[6] 42 U.S.C. §§ 671-679.

biological parent. ***In re N.C.***, 909 A.2d 818, 823 (Pa. Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." ***Id.*** (citation omitted).

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the following factors.

### § 6351. Disposition of dependent child

…

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4) The appropriateness and feasibility of the current placement goal for the child.
>
> (5) The likely date by which the placement goal for the child might be achieved.
>
> (5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.
>
> (6) Whether the child is safe.

…

> (9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child ….

42 Pa.C.S.A. § 6351(f). "These statutory mandates clearly place the trial court's focus on the best interests of the child." **S.B.**, **supra** at 978 (citation omitted). We have stated, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." **Id.** (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." **In re D.P.**, 972 A.2d 1221, 1227 (Pa. Super. 2009) (citation omitted).

Instantly, we conclude the record evidence demonstrates that DHS made reasonable efforts to reunify Mother with the Children. Further, the trial court did not commit an error of law or abuse its discretion in changing the Children's permanency goals to adoption. Betsy Lee, the DHS caseworker, testified that DHS provided In Home Protective Services to this family after learning that Mother tested positive for cocaine when she gave birth to her youngest child, T.S.A., in June 2012, and that Mother suffered from bipolar disorder but was not receiving mental health care. N.T.,

1/15/14, at 9. On August 20, 2012, after Mother had missed multiple medical appointments for T.S.A., DHS sent a nurse to Mother's home who found that T.S.A. had a low birth weight. *Id.* at 10; Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶¶ f-j. As a result, T.S.A. was admitted to St. Christopher's Hospital.

On August 23, 2012, DHS removed the Children from Mother's custody after learning that she refused to comply with a safety plan developed by DHS for the Children. N.T., 1/15/14, at 11; Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶¶ o-q. On August 24, 2012, DHS referred Mother to the Clinical Evaluation Unit (CEU). Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶ r. Following an evaluation at the CEU, Mother was diagnosed with cocaine and alcohol dependence. *Id.* at ¶ s. The CEU recommended that Mother participate in inpatient treatment at the Gaudenzia Diagnostic Rehabilitation Center (Gaudenzia) in Philadelphia. *Id.*

On August 29, 2012, the trial court adjudicated the Children dependent. Lee testified that the permanency goal for this family was reunification. N.T., 1/15/14, at 12. DHS established Family Service Plan (FSP) objectives for Mother including participating in a parenting program and in a drug and alcohol program. *Id.* at 13. Further, Mother was to obtain a psychological evaluation and to follow all recommendations. *Id.*; Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶ u. In

addition, DHS arranged for supervised visits on a biweekly basis for Mother and the Children. Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶ t. In total, DHS held FSP meetings in September and December of 2012, and in July of 2013. *Id.* at ¶¶ u, x, bb.

In September of 2012, DHS referred Mother to the Achieving Reunification Center (ARC) for parenting classes. N.T., 1/15/14, at 13. Lee testified that she met with Mother after becoming the caseworker for this family in January 2013 and that Mother told her she did not want to continue participating with ARC. *Id.* at 15. On March 7, 2013, ARC closed Mother's case for non-participation. *Id.* at 16-17; Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶ z. Lee testified that DHS provided Mother tokens for transportation but that she reduced Mother's tokens upon learning that she had stopped participating with ARC. N.T., 1/15/14, at 27-28. Lee testified that after she reduced Mother's tokens, she never heard from Mother again. *Id.*

In addition, the record reveals that the foster care agency established an Individual Service Plan (ISP) for Mother including attending visits with the Children, attending and completing parenting classes, securing appropriate housing, and attending and completing drug rehabilitation. *Id.* at DHS Exhibit 11. Lee testified that DHS changed the Children's goal to adoption two days before the subject proceeding because Mother failed to comply with her objectives. *Id.* at 21-22. The competent testimonial evidence

reveals that the only FSP and ISP objective Mother satisfied was consistently attending supervised visits. *Id.* at 30.

Indeed, with respect to her mental health objective, Mother testified she is diagnosed with "bipolar depressive" disorder, and she is not receiving treatment for it. N.T., 1/15/14, at 50-51. Mother implied she does not have medical insurance. *Id.* at 51. Moreover, Mother testified she has not requested that DHS help her acquire medication for her mental health needs. *Id.* With respect to housing, Mother testified she lives in a room that she rents and that the room is not large enough for the Children to live with her. *Id.* at 51-52. With respect to parenting classes, Mother testified she did not complete the program at ARC. *Id.* at 52. Further, with respect to the drug and alcohol program, Mother testified that, although she completed the program at Gaudenzia, she did not complete the program at ACT Recovery House, which Gaudenzia had recommended. *Id.* at 52-54, 57.

Based on the foregoing record evidence, we conclude that DHS made reasonable efforts to reunify Mother with the Children by providing in-home services, developing a safety plan, setting the Children's permanency goal as reunification, establishing FSP objectives, holding FSP meetings to review Mother's progress, and providing transportation tokens to help her comply with her objectives. Our case law is clear that the Commonwealth has not "made itself guarantor of the success of the efforts to help parents assume

their parental duties." ***In re A.L.D.***, 797 A.2d 326, 340 (Pa. Super. 2002) (citation omitted). Likewise, a parent has an affirmative duty to cooperate with DHS. ***Id.*** Here, the record demonstrates Mother has failed to cooperate with DHS in satisfying her FSP and ISP objectives and by stopping all communication with Lee in early 2013. N.T., 1/15/14, at 27-28. We therefore conclude DHS fulfilled its mandate to provide reasonable efforts.

In addition, we discern no abuse of discretion by the court in changing the Children's permanency goals to adoption. Lee testified that the Children reside in a pre-adoptive foster home, where their needs are met. N.T., 1/15/14, at 3, 5. The oldest child, D.K.R., who was in first grade at the time of the hearing, receives therapy for extreme sexual behavior. ***Id.*** at 3-4. Lee testified that, as a result of his behavior, DHS planned to move him to another foster home where he will be the only child or the youngest child. ***Id.*** at 4. Lee testified she is "hoping that [D.K.R.'s] behaviors will get better with therapy, as therapy goes along. He just began medication so we hope that his behaviors will get better and he can soon return to … his brother." ***Id.*** T.M., the Children's foster mother, testified that, "once they get some help for [D.K.R.], he is welcome back into my home." ***Id.*** at 44. Lee testified that T.M.A. does not have any special needs. ***Id.*** at 4-5. With respect to T.S.A., although Child Link Services monitors her because of her diagnosis of failure to thrive during infancy, Lee testified that T.S.A. is doing fine. ***Id.*** at 5. Based on the totality of the record evidence, we conclude

that changing the permanency goals to adoption furthers the safety, permanency, and well-being of the Children who had been in placement for nearly seventeen months at the time of the hearing. *See S.B.*, *supra*.

We next review the termination decrees according to the following standard of review.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an

> appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007), *citing* 23 Pa.C.S.A. § 2511. The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

It is well-established that child welfare agencies must make reasonable efforts to reunify a parent with his or her child prior to filing a termination petition. **In re Adoption of R.J.S.**, 901 A.2d 502, 507 (Pa. Super. 2006) (citation omitted). However, the failure of an agency to provide such efforts for reunification does not preclude the termination of parental rights. **In the Interest of D.C.D.**, --- A.3d ---, 2014 WL 7089267, *10 (Pa. 2014). We also note that the duties of agencies have reasonable limits. "If a parent fails to cooperate or appears incapable of benefiting from reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." **A.L.D.**, *supra*.

Instantly, as discussed above, we conclude that DHS made reasonable efforts to reunify Mother with the Children prior to filing the termination petitions. Further, we conclude that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b)    Other    considerations**.--The    court    in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With  respect  to  any  petition  filed  pursuant  to subsection  (a)(1),  (6)  or  (8),  the  court  shall  not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384

(Pa. Super. 2004) (*en banc*) (stating that this Court need only agree with

any one subsection of 2511(a), in addition to Section 2511(b), in order to

affirm the termination of parental rights), *appeal denied*, 863 A.2d 1141 (Pa.

2004).

To satisfy the requirements of Section 2511(a)(2), the moving party

must produce clear and convincing evidence regarding the following.

(1)  repeated  and  continued  incapacity,  abuse, neglect  or  refusal;  (2)  such  incapacity,  abuse, neglect  or  refusal  caused  the  child  to  be  without essential  parental  care,  control  or  subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination [of parental rights under Section 2511(a)(2),] due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *A.L.D.*, *supra* at 337 (citation omitted).

With respect to Section 2511(b), the requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the record evidence demonstrates that Mother's repeated and continued incapacity, neglect, and refusal to comply with her FSP and ISP objectives have caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Further, the causes of the incapacity, neglect or refusal cannot or will

not be remedied.[7]   As such, the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to 2511(a)(2).   ***See S.P.***, ***supra***.

With respect to Section 2511(b), Mother argues the record evidence does not support termination because DHS did not present expert testimony or a bonding evaluation.   We disagree.   It is well-established that, when evaluating a parental bond, "the court is not required to use expert testimony.   Social workers and caseworkers can offer evaluations as well.   Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1115-1116 (Pa. Super. 2010) (internal citations omitted).

Moreover, our Supreme Court has explained that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition."   ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).   The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 268 (citation omitted).   The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking

---

[7] Notably, Lee testified that Mother has eleven children in total, and that none of them reside with her.   N.T., 1/15/14, at 34.   Mother's parental rights have been terminated as to three of her older children.   Petition for Involuntary Termination of Parental Rights, Exhibit A, at ¶¶ a-c.

clock of childhood ever in mind." The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." ***Id.*** at 269.

In this case, the testimonial evidence reveals the Children know Mother who consistently attended supervised visits with them during their placement.[8] Indeed, they refer to Mother as "Mom." N.T., 1/15/14, at 31, 41. However, Amina Huff, who supervised visits for the foster care agency, testified that the Children are "[v]ery attached to the foster [m]om." ***Id.*** at 39. Huff testified as follows.

> Q. Do you feel there would be any detrimental effect
> on any one of the three children if the parental rights
> were terminated?
>
> A. No.
>
> Q. Why do you say that?
>
> A. Because just with the attachment they have with
> the foster parent. I don't see it ever being like that
> with either of the parents.

***Id.*** at 40. Likewise, Lee testified there would not be any negative effect on the Children if Mother's parental rights are terminated. ***Id.*** at 25. She

---

[8] Lee testified that Mother was incarcerated from September to December of 2013, and that she did maintain communication with the Children during that time. N.T., 1/15/14, at 19-20. Mother testified that she was arrested for aggravated assault as a result of a dispute with R.R., the father of D.K.R. Mother testified that she is not on probation or parole and that the charge resulting from the domestic dispute is fully resolved. ***Id.*** at 49.

testified the Children exhibit a mother/child bond with their foster mother. *Id.* at 24. Lee explained why it would not be detrimental to the Children to terminate Mother's parental rights as follows.

> The [C]hildren don't seem like they are really attached to Mom on that level. They go about their everyday life when I see them. It doesn't make a difference. They are not asking about Mom. They are not saying, when can I see my Mom again? When she was incarcerated, they didn't ask to see her or anything. They seemed to do just fine without [her].

*Id.* at 25.

Based upon our thorough review, we discern no abuse of discretion by the trial court in concluding that terminating Mother's parental rights "would best serve the developmental, physical, and emotional needs and welfare" of the Children. The record testimony reveals the existence of a bond with the foster mother and more importantly, a lack of bond between Mother and the Children. *See, e.g.*, *J.M.*, *supra*. We further observe that, although the Child Advocate did not file a brief in this appeal, the Child Advocate stated on the record in open court at the conclusion of the hearing that DHS met its burden of proof with respect to the involuntary termination of Mother's parental rights. *See S.P.*, *supra*. As a result, Mother's issues on appeal fail.

Based on the foregoing, we conclude all of Mother's issues are devoid of merit. Accordingly, the trial court's January 15, 2014 decrees

involuntarily terminating Mother's parental rights and orders changing the permanency goals to adoption are affirmed.

Decrees affirmed. Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/3/2015